COOLEY LLP
MATTHEW D. BROWN (196972) (brownmd@cooley.com)
AMY M. SMITH (287813) (amsmith@cooley.com)
101 California Street
5th Floor
San Francisco, CA  94111-5800
Telephone:     (415) 693-2000
Facsimile:     (415) 693-2222

Attorneys for Plaintiff
DISTINCT MEDIA LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DISTINCT MEDIA LIMITED, <br><br>  Plaintiff, <br><br> v. <br><br> LEV SHUTOV and DOE DEFENDANTS 1-50, <br><br>  Defendants. | Case No. 5:15-cv-03312-NC <br><br> **PLAINTIFF DISTINCT MEDIA LIMITED'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT LEV SHUTOV** <br><br> Date:       January 18, 2017 <br> Time:       1:00 p.m. <br> Judge:      Hon. Nathanael Cousins <br> Courtroom: 7 – 4th Floor <br>            280 S. First Street <br>            San Jose, CA 95113 <br> Trial Date: Not yet set |

1

**Table of Contents**

2

**Page**

3   I.   INTRODUCTION ........................................................................................ 1

4   II.   STATEMENT OF FACTS ......................................................................... 2

        A.   The Parties ........................................................................................ 2

5       B.   Defendants' Coordinated Jquery Attack on Distinct Media's Systems ................ 3

6       C.   Defendants' Use of the eBay and Amazon Referral Programs ............................ 5

7       D.   Procedural History and Service of Process ............................................. 6

    III.   ARGUMENT ............................................................................................. 8

8       A.   The Court Should Enter Default Judgment Under Federal Rule 55(b)(2) ............. 8

9            1.   Distinct Media Will Be Prejudiced if the Default is Denied ..................... 8

             2.   The Merits of the Claims and the Sufficiency of the Complaint ............... 9
10
                  a) Computer Fraud and Abuse Act ............................................. 9
11
                  b) California Comprehensive Computer Data Access and Fraud Act ...... 10
12
                  c) California Unfair Competition Law ....................................... 11
13           3.   The Amount of Money at Stake Supports Default Judgment ................. 12

             4.   There is No Real Dispute as to Any Material Facts ............................. 12
14
             5.   The Default Did Not Result from Excusable Neglect ............................ 13
15
             6.   Public Policy Favors Entering Default Judgment ................................ 13
16       B.   This Court Has Subject-Matter and Personal Jurisdiction ................................... 14

17           1.   The Court Has Subject Matter Jurisdiction ........................................ 14

             2.   The Court Has Personal Jurisdiction over Shutov ............................... 14
18
             3.   Shutov Was Properly Served ........................................................ 15
19
             4.   Venue is Proper ........................................................................ 15
         C.   The Court Should Award Damages ........................................................... 15
20
         D.   The Court Should Enter a Permanent Injunction Against Shutov ....................... 19
21   IV.   CONCLUSION ......................................................................................... 20

22

23

24

25

26

27

28

# Table of Authorities

**Page(s)**

**Cases**

*Chanel, Inc. v. Lin*,
No. C-09-04996 JCS, 2010 U.S. Dist. LEXIS 61295 (N.D. Cal. May 7, 2010) ..................... 19

*CollegeSource, Inc. v. AcademyOne, Inc.*,
No. 10-3542, 2012 U.S. Dist. LEXIS 153197 (E.D. Pa. Oct. 25, 2012) ................................ 16

*Craigslist, Inc. v. Kerbel*,
No. C-11-3309 EMC, 2012 U.S. Dist. LEXIS 108573 (N.D. Cal. Aug. 2, 2012) ............ 12, 19

*Eitel v. McCool*,
782 F.2d 1470 (9th Cir. 1986) ......................................................................................... 8, 9, 13

*Elektra Entm't Grp. Inc. v. Crawford*,
226 F.R.D. 388 (C.D. Cal. 2005) ...................................................................................... 12, 13

*Facebook, Inc. v. Power Ventures, Inc.*,
No. 08-CV-5780-LHK, 2013 WL 5372341 (N.D. Cal. Sept. 25, 2013) ......................... 16, 17

*Geddes v. United Fin. Grp.*,
559 F.2d 557 (9th Cir. 1977) .................................................................................................... 2

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) .................................................................................................... 9

*Gucci Am., Inc. v. Huoqing*,
No. C-09-05969 JCS, 2011 U.S. Dist. LEXIS 783 (N.D. Cal. Jan. 3, 2011) ......................... 19

*Guo v. 8BO.COM*,
No. 13-CV-05299 NC, 2015 WL 4914731 (N.D. Cal. July 15, 2015) ...................................... 2

*Iconix, Inc. v. Tokuda*,
457 F. Supp. 2d 969 (N.D. Cal. 2006) ................................................................................... 20

*Int'l Shoe Co. v. State of Wash.*,
326 U.S. 310 (1945) ............................................................................................................... 14

*JBR, Inc. v. Cafe Don Paco, Inc.*,
No. 12-CV-02377 NC, 2014 WL 5034640 (N.D. Cal. Aug. 25, 2014) .......................... *passim*

*MCA Records Inc. v. Charly Records Ltd.*,
108 F.3d 338 (9th Cir. 1997) ................................................................................................. 14

*Multiven, Inc. v. Cisco Sys., Inc.*,
725 F. Supp. 2d 887 (N.D. Cal. 2010) ............................................................................. 10, 16

*NCMIC Fin. Corp. v. Artino*,
638 F. Supp. 2d 1042 (S.D. Iowa July 28, 2009) .................................................................. 17

ii

**Table of Authorities**
(cont'd)

**Page(s)**

*O'Reilly v. Valley Entm't, Inc.*,
  No. C-09-3580-CW, 2011 U.S. Dist. LEXIS 15826 (N.D. Cal. Jan. 4, 2011) ..........................8

*PepsiCo, Inc. v. Cal. Sec. Cans*,
  238 F. Supp. 2d 1172 (C.D. Cal. 2002)....................................................................................13

*Philip Morris USA, Inc. v. Castworld Prods., Inc.*,
  219 F.R.D. 494 (C.D. Cal. 2003) ...................................................................................8, 9, 13

*Shamrock Foods Co. v. Gast*,
  535 F. Supp. 2d 962 (D. Ariz. 2008)........................................................................................16

*SuccessFactors, Inc. v. Softscape, Inc.*,
  544 F. Supp. 2d 975 (N.D. Cal. 2008) ...............................................................................16, 17

*Threlkeld v. Tucker*,
  496 F.2d 1101 (9th Cir. 1974)...................................................................................................14

*In re Tuli*,
  172 F.3d 707 (9th Cir. 1999).....................................................................................................14

*Walters v. Statewide Concrete Barrier, Inc.*,
  No. 04–cv–02559 JSW (MEJ), 2006 WL 2527776 (N.D. Cal. Aug. 30, 2006) ......................12

*W. Reserve Life Assur. Co. v. Canul*,
  No. 11-cv-01751 AWI (JLT), 2012 U.S. Dist. LEXIS 32845 (E.D. Cal. Mar.
  12, 2012) ...................................................................................................................................12

**Statutes**

18 U.S.C. § 1030 .................................................................................................................... *passim*

28 U.S.C. § 1331 ...........................................................................................................................14

Cal. Bus. & Prof. Code
  § 17200............................................................................................................................2, 11
  § 17203...............................................................................................................................19

Cal. Civ. Proc. Code § 410.10................................................................................................14

Cal. Penal Code § 502 ............................................................................................................ *passim*

**Other Authorities**

Federal Rules of Civil Procedure
  Rule 4 ..............................................................................................................................7, 15
  Rule 12 ................................................................................................................................7
  Rule 55 ................................................................................................................................8

Cooley LLP
Attorneys At Law
San Francisco

iii

Motion for Default Judgment
Case No. 5:15-cv-03312-NC

## NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT

**PLEASE TAKE NOTICE** pursuant to Federal Rule of Civil Procedure 55(b) that on January 18, 2017, or as soon thereafter as this matter may be heard by the above-titled Court, located at 280 S. First Street, Courtroom 7, 4th Floor, San Jose, California 95113, Plaintiff Distinct Media Limited ("Distinct Media") will present its Motion for Default Judgment ("Motion") against Defendant Lev Shutov ("Shutov").

For the reasons set forth in the accompanying memorandum of points and authorities, Distinct Media is entitled to judgment against Shutov on all of the claims pleaded in the Complaint.

Distinct Media requests an award of $3,071,524.27 in damages, as well as disgorgement in the amount received in payments by Shutov as a result of his fraudulent scheme, pursuant to 18 U.S.C. § 1030(g), Cal. Penal Code § 502(e), and California Business and Professions Code §§ 17200, *et seq.*

Distinct Media further requests that this Court grant permanent injunctive relief enjoining Shutov and all others acting in concert with Shutov from:

    **(a)**    Accessing or attempting to access Distinct Media's computers, computer systems, or computer networks;

    **(b)**    Deleting, altering, modifying, or adding data, code, programs, or other unauthorized information to Distinct Media's computers, computer systems, or computer networks; and

    **(c)**    Any further acts constituting violations of the CFAA, § 502, or the UCL with respect to Distinct Media and its computers, computer systems, and computer networks.

This Motion is based on this Notice of Motion, the accompanying memorandum of points and authorities in support of the Motion, the Declarations of Thomas Howsam, Alex Zaslavsky, and Matthew D. Brown and attached exhibits filed herewith, all pleadings and papers on file in this matter, and upon such other information and argument as may be presented to and properly considered by the Court at the time of the hearing or otherwise. Accordingly, Distinct Media

1   hereby requests that the Court enter the proposed order on Distinct Media's Motion lodged

2   herewith.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

This action concerns a fraudulent scheme in which Shutov and the Doe Defendants infected Distinct Media's servers with a malicious script that remained hidden for years.  Roughly three in every hundred times Internet users clicked on ads hosted on Distinct Media's websites, the malicious script would instruct Distinct Media's servers to redirect that web traffic to websites maintained by Defendants.  Defendants' websites would, in turn, direct that traffic to third parties, and Defendants would collect a fee in the process.  Not only did Defendants steal traffic in this way, the script operated so that Distinct Media's servers continued to report these "clicks" as if they had arrived at their originally intended destination.  As such, Distinct Media unintentionally continued to collect click payments from its contract partner, Yahoo! ("Yahoo"), despite the fact that the traffic paid for never arrived where it was supposed to.  Yahoo eventually discovered that not all of the clicks it was being invoiced for were proper.  Upon being informed of this fact, Distinct Media launched an investigation to uncover the malicious script and to determine its origin, hiring Deloitte Consulting LLC and Cooley LLP, and expending considerable sums along the way.  Yahoo required that Distinct Media reimburse Yahoo for the improper click fees and pay a $1,000,000 penalty, and Distinct Media complied.  Distinct Media filed a lawsuit, naming Doe Defendants, so that it could use the power of the courts to help discover the culprits.

Distinct Media's investigation uncovered the script operating in its servers and ultimately traced it back to Shutov.  This was done in part by tracking the payments that were generated from the diverted traffic.  Shutov had been hired as a contractor years earlier to design parts of Distinct Media's computer systems and networks, presumably gaining knowledge he would later use.  With this information in hand, Distinct Media amended its complaint to name Shutov.

Shutov, a resident of Russia, was properly served in March 2016.  He impliedly acknowledged receipt of the summons when he caused a letter to be sent to the Court in April 2016, referencing the action.  He did not, however, respond to the Complaint and failed to participate in any manner in the litigation.  The Court ordered the clerk to enter default, which the clerk did on August 18, 2016.

Now before the Court is Distinct Media's Motion for Default Judgment.  Distinct Media's allegations sufficiently state claims against Shutov for violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*. ("CFAA"), the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502. ("§ 502"), and the California Business and Professions Code §§ 17200, *et seq*. ("UCL").   Shutov is deemed to have admitted these allegations by virtue of refusing to litigate the action.  Because the Court has jurisdiction, because the allegations are sufficient, and because the costs and losses sustained by Distinct Media are demonstrable, this Court should grant the Motion for Default Judgment, order payment of Distinct Media's damages resulting from Shutov's unlawful acts, and order a permanent injunction against Shutov and his co-conspirators to prevent further violations of Distinct Media's rights.

## II.     STATEMENT OF FACTS

Unless otherwise noted, the following facts are from the SAC.  The allegations in the SAC, with the exception of allegations concerning damages, must be deemed admitted and taken as true.  *Guo v. 8BO.COM*, No. 13-CV-05299 NC, 2015 WL 4914731, at *3 (N.D. Cal. July 15, 2015) (noting that well-pleaded allegations in a complaint are deemed admitted by defendant for purposes of motion for default judgment) (Cousins, J.); *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (same).

### A.     The Parties

Plaintiff Distinct Media operates approximately 80 price comparison websites around the world, including approximately 20 websites in the United States.  (SAC ¶ 1.)  Pursuant to agreements with third-party advertisers or advertising networks, Distinct Media displays advertisements on its websites and is paid a small fee each time an Internet user clicks on an ad and is directed to the advertiser's website.  (*Id*. ¶ 5.)  These "pay-per-click" agreements are one of Distinct Media's primary sources of revenue.  (*Id*.)  On or about March 1, 2009, Distinct Media entered into a pay-per-click agreement ("Agreement") with Yahoo, which provides ad inventory to Distinct Media on behalf of advertisers.  (*Id*. ¶ 6.)  If a user clicks on an ad provided by Yahoo that appears on one of Distinct Media's websites, then Yahoo pays Distinct Media a small fee,

and typically the user who clicks on the ad is taken to the website linked to in the ad.  (*Id.*) However, under the terms of the Agreement, Yahoo will only pay for authentic clicks made by independent Internet users, and Distinct Media is prohibited from using code or JavaScript commands to generate artificial clicks.  (*Id.* ¶ 7.)

Defendant Shutov is a resident of Yoshkar-Ola, Russia.  (*Id.* ¶ 2.)  Shutov was one of approximately six software engineers employed by CPS Labs, a contractor involved with the design of Distinct Media's databases, computers, computer programs, and computer networks ("Distinct Media's Systems").  (*Id.* ¶ 9.)  In his capacity as lead software developer, Shutov played a central role in the coding and design of Distinct Media's Systems.  (*Id.* ¶ 10.)  CPS Lab's contract with Distinct Media concluded in or about April 2011, and Shutov was thereafter no longer affiliated with Distinct Media in any capacity.  (*Id.* ¶ 12.)  At the time the Complaint was filed, Shutov's wife, Irina Shutova, was an employee of Distinct Media.  (*Id.*)

Doe Defendants 1-50 ("Doe Defendants") are one or more individuals, business entities, corporations, registered private companies, limited liability companies, partnerships, or other organizations of unknown residence and citizenship that acted together, in concert with Shutov, to instigate and sustain a cyberattack against Distinct Media.  (*Id.* ¶ 3.)

**B.     Defendants' Coordinated Jquery Attack on Distinct Media's Systems**

On or about April 2013, Shutov, possibly in conjunction with Doe Defendants (collectively, the "Defendants"), caused a jquery.forms.js file ("Jquery File") to be embedded in a development server used by Distinct Media.  (*Id.* ¶ 13.)  Defendants did this without the knowledge or consent of Distinct Media.  (*Id.*)  Defendants caused this Jquery File to be transferred to one of the servers Distinct Media leases in the United States, named "Web 1."  (*Id.*) Again, Defendants did so without Distinct Media's knowledge or consent.  (*Id.*)  Web 1 serves 28 Distinct Media websites, all of which were infected with the Jquery File.  (*Id.*)  Distinct Media was unaware of the Jquery File's existence until November 10, 2014.  (*Id.* ¶ 14.)

At a November 10, 2014 meeting, Yahoo alerted Distinct Media to unusual online activity involving Distinct Media's websites and affecting Yahoo ad placement.  (*Id.*)  At this meeting, Yahoo showed Distinct Media a video of a computer screen depicting a user accessing a website

that displays Yahoo ads.  (*Id*.)   While the website was loading, the loading process was interrupted by an unusual delay of a few seconds and then a Yahoo ad on the website was activated, as though it had been clicked, but the video showed that the user's mouse was not hovering over the Yahoo ad when it was activated.  (*Id*.)   According to Yahoo, this video demonstrated that Distinct Media was automatically clicking ("auto-clicking") on Yahoo ads in violation of the Agreement.  (*Id*.)

Distinct Media retained Deloitte Consulting LLP ("Deloitte") to serve as a forensic computing consultant to investigate the source and impact of the Jquery File and provide an independent report.  (*Id*. ¶ 15.)  Distinct Media continued its own internal analysis alongside Deloitte's independent investigation.  (*Id*.)

Distinct Media's investigation revealed that approximately 3 out of every 100 times a Distinct Media website loaded, Defendants' Jquery File, a kind of computer script, would modify the appearance of a Yahoo ad so that it would look like an ad for content on Amazon.com ("Amazon") or eBay.com ("eBay"), websites that display goods offered for sale.  (*Id*. ¶ 16.)  In other words, an icon for what appeared to be an ad for content on Amazon or eBay was superimposed on top of the Yahoo ad, so that the user thought he or she was looking at an Amazon or eBay ad.  (*Id*.)   When the user clicked on the fake Amazon or eBay ad ("Fake Ads"), two things happened simultaneously: (1) the Yahoo ad underneath the Fake Ad was recorded as having been clicked, incurring a click fee; and (2) a new browser window opened to a new website not affiliated with Distinct Media or Yahoo: click-meter.com.  (*Id*.)   Distinct Media's investigations revealed that the click-meter.com website is operating under a fraudulent domain, masquerading as a real company: clickmeter.com.  (*Id*.)  The fraudulent click-meter.com website then directed the user to one of two websites, also not affiliated with Distinct Media or Yahoo, store.cartideas.com and store.pricepicker.net.  (*Id*.)  From there, these two websites directed users to Amazon or eBay, depending on which Fake Ad was superimposed on top of the real Yahoo ad that was "clicked."  (*Id*.)  Thus, Defendants' Jquery File forced Yahoo to incur a click fee to Distinct Media, even though the user was redirected to Amazon and eBay's websites and never visited the website associated with the Yahoo ad.  (*Id*.)

Until Yahoo brought the video to Distinct Media's attention on November 10, 2014, Distinct Media had no reason to know that Defendants' Jquery File had infected its systems because Distinct Media's 28 infected websites were incurring fake clicks on Fake Ads only approximately 3% of the time. (*Id.* ¶ 17.) Distinct Media presented the results of its investigation to Yahoo to show that Distinct Media was the victim of Defendants' cyberattack, and that Distinct Media was not responsible for an auto-click scheme. (*Id.*) However, because Distinct Media was unable to identify Defendants at that time, Distinct Media was forced to pay Yahoo significant amounts for what Yahoo asserted to be a breach of the Agreement. (*Id.*; Declaration of Thomas Howsam in Support of Motion for Default Judgment ("Howsam Decl.") ¶ 11.) Specifically, Distinct Media was forced to pay Yahoo a total of $2.891 million. (*Id.*)

## C.  Defendants' Use of the eBay and Amazon Referral Programs

Defendants' Jquery File redirected user traffic from Distinct Media's websites to Amazon or eBay by disguising the Yahoo ads as Fake Ads for Amazon or eBay. (SAC ¶ 18.) Defendants operate the store.cartideas.com and store.pricepicker.net domains and earned commissions from Internet traffic they diverted from Distinct Media's websites. (*Id.*)

Amazon and eBay have referral agreements with individuals or companies ("referral sources"). (*Id.* ¶ 19.) When a referral source directs an Internet user to Amazon's website and the user makes a qualified purchase, Amazon will pay the referral source a commission based on the user's purchase. (*Id.*) Similarly, when a referral source directs Internet user traffic to eBay and its partner websites, eBay will pay the referral source based on the volume and type of traffic. (*Id.*)

Defendants established multiple eBay and Amazon accounts in order to earn commissions from the Internet traffic they acquired without authorization from Distinct Media's websites. (*Id.* ¶ 20.) In order to receive payments from eBay and Amazon, Shutov established online payment accounts through MTACC and eCoin.com ("eCoin"). (*Id.*; Declaration of Alex Zaslavsky in Support of Motion for Default Judgment ("Zaslavsky Decl.") ¶ 5.) Shutov received payments from eBay and Amazon at these MTACC and eCoin accounts, and then transferred a portion of these commissions to at least one other Defendant. (SAC ¶ 20.) Defendants opened one eBay

Partner Network account in July 2013.  (*Id*. ¶ 21.)  Between at least July 2013 and December 2014, Defendants diverted Internet traffic from Distinct Media's Systems to eBay's website using the Jquery File, Fake Ads, and store.pricepicker.net and store.cartideas.com domains.  (*Id*.)  In setting up the eBay Partner Network account, Defendants identified "Russell Flack" as the contact person for the account, and identified Shutov's MTACC account for purposes of receiving payments.  (*Id*.)  According to the transaction history of Shutov's MTACC account alone, eBay paid Shutov more than $335,000 in the period between July 2013 and December 2014. (Zaslavsky Decl. ¶ 8.)

Defendants also opened two Amazon Associates accounts to earn commissions on Internet traffic they diverted from Distinct Media's Systems to Amazon's website using Defendants' Jquery File, Fake Ads, and store.pricepicker.net and store.cartideas.com domains.  (SAC ¶ 22.) Shutov also received more than $24,000 in payments from Amazon at his MTACC account.  (*Id*. ¶ 23.)  Once he received payments from eBay and Amazon in his MTACC and eCoin accounts, Shutov then transferred approximately 20 percent of those payments to at least one other Defendant using online exchanges, such as Bitcoin, or ATM transfers.  (*Id*. ¶ 24.)  Shutov continued to transfer a portion of these commissions to at least one other Defendant until late 2014. (*Id*.)

According to Alex Zaslavsky, the Chief Executive Officer of MTACC, Shutov has a balance of $155,293.76 in his MTACC account.  (Zaslavsky Decl. ¶ 7.)  Shutov's MTACC account was frozen in December 2015, and on information and belief, those funds are still available. (*Id*. ¶ 9.)

**D.    Procedural History and Service of Process**

The initial complaint in this action was filed on July 16, 2015.  (Dkt. No. 1.)  Distinct Media consented to magistrate judge jurisdiction on July 30, 2015.  (Dkt. No. 7.)  An Amended Complaint was filed on October 6, 2015.  (Dkt. No. 12.)  The SAC, naming Shutov as a defendant, was filed on March 17, 2016.  (Dkt. No. 26.)

The summons to Shutov was issued on March 21, 2016.  (Dkt. No. 30.)  Distinct Media retained experienced Russian counsel at the GRATA International Law Firm in Moscow in order

to serve Shutov in Russia in accordance with Russian and American law.  Through its Russian counsel, Distinct Media used two methods to serve Shutov in compliance with Rules 4(f)(2)(C) and 4(f)(2)(A) of the Federal Rules of Civil Procedure: (1) by personal delivery through DHL Express courier, and (2) by registered mail through the Russian Post system.  (Dkt. Nos. 52 at 2; 52-1 at ¶ 5.)  DHL Express delivered English and Russian-translated copies of the summons and Complaint to Shutov on March 28, 2016, and the Yoshkar-Ola Post Office delivered the same documents to Shutov by registered mail on April 14, 2016.  (Dkt. No. 52-1 at ¶ 5.)  Distinct Media filed a proof of service attaching the signed confirmation of DHL Express delivery on April 19, 2016, and filed a proof of service attaching the signed confirmation of registered mail delivery on August 12, 2016.  (Dkt. Nos. 36, 51.)

Pursuant to Federal Rule of Civil Procedure 12(a)(1)(A), Shutov had until April 18, 2016—21 days from service of the Summons and Second Amended Complaint on March 28, 2016—to file a responsive pleading.  On April 15, 2016, counsel for Shutov sent a letter to the clerk of the Court by email.  (Dkt. No. 33.)  On April 19, 2016, the clerk filed a "Notice re: Failure to File Electronically and/or Register as an E-Filer," notifying Shutov that this letter was filed in violation of Civil Local Rule 5-1, which requires counsel to register as ECF users and file documents electronically in this matter.  (Dkt. No. 35.)  Pursuant to Civil Local Rule 5-1(c)(2), Shutov's counsel is required to file a notice of appearance electronically.  No such notice has been filed, and no effective answer or other proper response has been filed or served as required by the Federal Rules of Civil Procedure.

Neither Shutov nor any attorney representing Shutov filed a case management statement or made an appearance at the May 4, 2016 case management conference.

On August 17, 2016, the Court entered an Order Directing Clerk's Office to Enter Default as to Shutov.  (Dkt. No. 53.)  The clerk entered default as to Shutov on August 18, 2016.  (Dkt. No. 54.)

III.    **ARGUMENT**

A.    **The Court Should Enter Default Judgment Under Federal Rule 55(b)(2)**

Default judgment is a two-step process governed by Rule 55.  The first step, entry of default by the clerk under Rule 55(a), has already occurred.  (Dkt. 54.)

The second step, entry of default judgment under Rule 55(b)(2), requires consideration of several factors, including: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong public policy . . . favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Each of these factors strongly favors the entry of a default judgment against Shutov.

1.    **Distinct Media Will Be Prejudiced if the Default is Denied**

Shutov has elected not to defend himself in court.  By defaulting, Shutov is deemed to have admitted the allegations that he improperly accessed Distinct Media's Systems and orchestrated a Jquery File attack.  As discussed below, these allegations set out claims for violations of the CFAA, § 502, and the UCL.  *See* §§ III(A)(2)(a)-(c), *infra*.  Distinct Media has suffered significant damages and incurred substantial legal fees and costs as a result of these violations.  *See* § III(C), *infra*.  If default is denied, Distinct Media will be unable to recover for the damages it has incurred as a result of Shutov's conduct.  "If plaintiff would be without a remedy if default judgment is denied, this factor weighs in favor of granting default judgment." *JBR, Inc. v. Cafe Don Paco, Inc.*, No. 12-CV-02377 NC, 2014 WL 5034640, at *11 (N.D. Cal. Aug. 25, 2014) (discussing prejudice to plaintiffs) (Cousins, J).  Shutov's failure to answer leaves Distinct Media with no way to resolve its claims, other than through a default judgment.  *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003); *O'Reilly v. Valley Entm't, Inc.*, C-09-3580-CW, 2011 U.S. Dist. LEXIS 15826, at *19-20 (N.D. Cal. Jan. 4, 2011) (concluding that the plaintiff was prejudiced where without entry of a default judgment the plaintiff would be denied judicial resolution of the claim).  This factor favors entry of default judgment here.

### 2.      The Merits of the Claims and the Sufficiency of the Complaint

"The second two *Eitel* factors require that a plaintiff state a claim on which the [plaintiff] may recover." *Philip Morris USA, Inc.*, 219 F.R.D. at 499 (internal quotations and citation omitted). This Court has already determined that the SAC states claims that could be recovered upon. The Court ruled on Distinct Media's *ex parte* motions for expedited discovery. (*E.g.*, Dkt. No. 41.) The Court noted that under *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980), the Court's ruling on a motion for expedited discovery must consider whether "the plaintiff's suit against defendant could withstand a motion to dismiss." (Dkt. No. 41 at 2.) The Court found that the allegations in the SAC were sufficient for this purpose. (*Id.* at 3 (granting Plaintiff's Fifth Motion for Expedited Discovery and noting the Court had already determined "the suit could withstand a motion to dismiss").) Thus, the second two *Eitel* factors favor default judgment. Although Distinct Media believes that the Court's prior ruling is dispositive of these two factors, additional support for the Court's prior ruling is set out here.

### a)  Computer Fraud and Abuse Act

The SAC alleges violations of the CFAA, specifically §§ 1030(a)(4), 1030(a)(5)(A), 1030(a)(5)(B), and 1030(a)(5)(C). (SAC ¶¶ 28-32.) Distinct Media's computers, computer systems, and computer networks are connected to the Internet and are "protected computers" within the meaning of § 1030(e). (*Id.* ¶ 28); 18 U.S.C. §§ 1030(e)(1), (e)(2)(B). The SAC alleges, and therefore the court must deem as admitted, that Shutov knowingly and with intent to defraud accessed Distinct Media's protected computers to implant the Jquery File without authorization, and did so to fraudulently secure payments well in excess of $5,000. (SAC ¶¶ 13-25, 29.) This was in violation of CFAA § 1030(a)(4). The SAC also alleges that Shutov knowingly caused the Jquery File to be transmitted to Distinct Media's protected computers, causing damage, and thereby violating CFAA § 1030(a)(5)(A). (*Id.* ¶¶ 13-25, 30.) Finally, the SAC's allegations make clear that Shutov knowingly accessed Distinct Media's protected computers without authorization, causing damage and loss—and that he did so recklessly, as he understood that his conduct defrauded Distinct Media and its ad partner Yahoo—in violation of CFAA §§ 1030(a)(5)(B) and (a)(5)(C). (*Id.* ¶¶ 13-25, 31-32.) Moreover, Shutov's name on the MTACC

account in which the fraudulently induced payments were deposited further confirms his involvement.  (Zaslavsky Decl. ¶ 5.)

This conduct caused damage and loss, and the loss caused exceeded $5,000, satisfying CFAA § 1030(g) and those sections of CFAA Shutov is alleged to have violated.  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(11).  Shutov's conduct impaired the integrity of Distinct Media's data, programs, systems, and information by causing Distinct Media's Systems to improperly direct traffic and display ads, and to falsely catalog clicks.  (SAC ¶ 16.)  The data and information reported to Yahoo was corrupted as a result.  (*Id*.)  "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11); *see also Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the statute.").  Distinct Media spent well in excess of $5,000 investigating Shutov's scheme—for example, spending over $20,000[1] to hire forensic investigators, among other costs.  (Howsam Decl. ¶ 9.)

### b) California Comprehensive Computer Data Access and Fraud Act

The SAC alleges violations of §§ 502(c)(1)(A)-(B) and 502(c)(2)-(4) and (6)-(8) of the California Penal Code.  (SAC ¶¶ 38-45.)  The SAC alleges, and the Court must deem admitted, that Shutov knowingly accessed and used Distinct Media's Systems, which consist of Distinct Media's databases, computers, computer programs, and computer networks.  (*Id*. ¶¶ 8, 13, 18-22.)  The SAC further alleges that this access and use was without the knowledge or permission of Distinct Media.  (*Id*. ¶¶ 13-14.)  The SAC's allegations show that through this conduct Shutov knowingly and without permission (i) made alterations to Distinct Media's Systems to execute a

---

[1] Deloitte Consulting LLP's invoice for forensic services was for £16,777.  (Howsam Decl. ¶ 9.)  That converts to well over USD $20,000.  (*Id*.)

10

1  scheme or artifice to defraud, and to wrongfully control payments and data, by instructing the

2  Systems to redirect traffic from Distinct Media's websites to other websites (*id*. ¶¶ 13-25);

3  (ii) made use of data from Distinct Media's Systems to the same end (*id*. ¶¶ 13, 16, 18); (iii) made

4  use of Distinct Media's computer services by using data processing and storage functions to store

5  the Jquery File and redirect the traffic in question (*id*. ¶¶ 13, 18); (iv) disrupted Distinct Media's

6  computer services by diverting traffic that otherwise would have arrived at different websites and

7  by altering the webpage displays shown to third parties (*id*. ¶¶ 13, 16, 18); and (v) provided a

8  means of accessing Distinct Media's Systems by embedding a script that continuously operated

9  (*id*. ¶¶ 13, 18). Shutov's conduct therefore violated §§ 502(c)(1)(A)-(B) and 502(c)(2)-(7). The

10  Jquery File is also a "computer contaminant" within the meaning of § 502(a)(12), as it is a "set of

11  computer instructions that are designed to modify . . . or transmit information within a computer,

12  computer system, or computer network" without permission. Cal. Penal Code § 502(a)(12). As

13  such, Shutov's introduction of the Jquery File onto Distinct Media's servers violated § 502(c)(8).

14  ### c) California Unfair Competition Law

15  Shutov knowingly accessed and altered Distinct Media's Systems without authorization in

16  order to divert Internet traffic from Distinct Media websites to eBay and Amazon for Shutov's

17  unjust gain. (SAC ¶¶ 13-25, 49.) This conduct violated both the CFAA and § 502, *see*

18  §§ III(A)(2)(a)-(b), *supra*, and therefore violated the "unlawful" prong of the UCL. *See* Cal. Bus.

19  & Prof. Code § 17200. Shutov unjustly stole traffic and ad revenue from Distinct Media and

20  therefore also violated the "unfair" prong of the UCL. *Id*. Finally, Shutov's scheme was

21  intentionally designed in a manner to avoid detection and Shutov and the Doe Defendants

22  operated this scheme for years without the knowledge of Distinct Media. As such, Shutov

23  violated the "fraudulent" prong of the UCL. *Id*. As discussed in the SAC, these actions had

24  numerous effects in California (SAC ¶ 52) and caused Distinct Media significant loss of money

25  and property (*id*. ¶ 53).

26

27

28

### 3.   The Amount of Money at Stake Supports Default Judgment

The damages sought are directly proportional to the harm caused and therefore this factor favors default judgment. *JBR, Inc.*, 2014 WL 5034640, at *13 ("If the sum of money at issue is reasonably proportionate to the harm caused by the defendant's actions, then default judgment is warranted.") (quoting *Walters v. Statewide Concrete Barrier, Inc.,* No. 04–cv–02559 JSW (MEJ), 2006 WL 2527776, at *4 (N.D. Cal. Aug. 30, 2006)).

Distinct Media has suffered at least $180,524.27 in costs incurred to investigate and remediate Shutov's unlawful infiltration, and at least $2.891 million in other damages directly caused by Shutov's attack on its systems (*see* § III(C), *infra*).   The seriousness of Shutov's conduct and the significant costs and damages Distinct Media incurred as a result support entry of default judgment here.

Distinct Media also seeks injunctive relief to prevent Shutov from continuing to unlawfully access or modify Distinct Media's proprietary systems, and "[i]t is appropriate to grant an injunction on an application for default judgment." *Craigslist, Inc. v. Kerbel*, No. C-11-3309 EMC, 2012 U.S. Dist. LEXIS 108573, at *44 (N.D. Cal. Aug. 2, 2012) (granting motion for default judgment in case involving circumvention of security and copyright protection measures) (citation omitted).

### 4.   There is No Real Dispute as to Any Material Facts

There is no real dispute as to any material facts in the case because Distinct Media "filed a well-pleaded Complaint alleging the elements necessary to prevail on [its] cause[s] of action." *Elektra Entm't Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005).  Shutov was served and had the opportunity to contest the SAC, but failed to do so. *JBR, Inc*, 2014 WL 5034640, at *14 ("Because the defendants have not made an effort to challenge the complaint, there is nothing to suggest that a dispute in the facts exists."); *see also W. Reserve Life Assur. Co. v. Canul*, No. 11-cv-01751 AWI (JLT), 2012 U.S. Dist. LEXIS 32845, at *7 (E.D. Cal. Mar. 12, 2012) ("[T]here is little possibility of dispute concerning material facts because (1) based on the entry of default, the Court accepts all allegations in Plaintiff's Complaint as true and (2) Defendant has not made any effort to challenge the Complaint or otherwise appear in this case.").

### 5.    The Default Did Not Result from Excusable Neglect

Due process requires that parties be given actual notice and an opportunity to present the merits of their positions. *Philip Morris*, 219 F.R.D. at 500.  Where a party receives notice and simply does not respond, "the possibility of excusable neglect is remote."  *Id.* at 501; *see also Elektra Entm't Grp.*, 226 F.R.D. at 393 (finding no excusable neglect where defendant had notice of the complaint and motion for default judgment, and where six months passed since service of the Complaint and four months passed since entry of default).

Shutov has been properly served and has been put on notice of the entry of default and the motion for default judgment. *See* § II(D), *supra*.  As a result, the possibility of "excusable neglect is remote," and "this factor warrants granting a default judgment." *Elektra Entm't Grp.*, 226 F.R.D. at 393.  "Generally, courts will not find a defendant's failure to participate excusable where the defendant has been properly served and has notice of the entry of default and the motion for default judgment." *JBR, Inc.*, 2014 WL 5034640, at *14.  Shutov has made no claim that he defaulted for some excusable reason.  Rather, Shutov's one communication with the court suggested that he was simply unwilling to litigate this action in the United States.  (Dkt. No. 33.)

### 6.    Public Policy Favors Entering Default Judgment

Although public policy generally favors decisions on the merits, *see, e.g.*, *Eitel*, 782 F.2d at 1472, where a defendant refuses to answer, a "decision on the merits [is] impractical if not impossible." *Elektra Entm't Grp.*, 226 F.R.D. at 393 (citation omitted).  As a result, "the preference to decide cases on the merits does not preclude a court from granting default judgment." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (citation omitted).  Shutov has refused to participate in this litigation despite the fact that he has had ample opportunity to appear and respond to the SAC.  Shutov's inaction provides Distinct Media no "recourse for recovery." *Id.* ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").  As a result, the factors of prejudice to Distinct Media and the policy favoring decisions on the merits favor the entry of default judgment against Shutov.

### B.   This Court Has Subject-Matter and Personal Jurisdiction

This Court has both subject-matter and personal jurisdiction, and accordingly may enter default judgment. *JBR, Inc.*, 2014 WL 5034640, at \*4 (citing *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999)).

### 1.   The Court Has Subject Matter Jurisdiction

The Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because the SAC alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*.

### 2.   The Court Has Personal Jurisdiction over Shutov

The Court has already found that it has personal jurisdiction over the Defendants, as the Defendants' fraudulent scheme was directed toward California.[2]  (Dkt. No. 11 at 5 ("[T]he Court finds that defendants have purposefully directed their activities towards California and have thus subjected themselves to this Court's jurisdiction.").)  As discussed here, there is no reason that the Court should find differently now.

District courts in California may exercise personal jurisdiction over a nonresident defendant to the extent permitted by the Due Process Clause of the Constitution.  Cal. Civ. Proc. Code § 410.10; *Threlkeld v. Tucker*, 496 F.2d 1101, 1103 (9th Cir. 1974).  The Due Process Clause requires that the defendant have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citations omitted).  Where a defendant has defaulted, plaintiff "need only have made a prima facie showing of jurisdiction over" the defendant.  *MCA Records Inc. v. Charly Records Ltd.*, 108 F.3d 338 (9th Cir. 1997).  The test for personal jurisdiction is met here, under the prima facie standard or any other standard.

Shutov purposefully directed his activities toward California.  Shutov and the Doe Defendants took intentional actions to orchestrate the Jquery File attack.  These actions were

---

[2] The Court made this determination before the complaint was amended to name Shutov, but the conduct alleged against Shutov in the SAC is the same conduct that the Court identified as the basis for personal jurisdiction.

1  expressly aimed at California in three ways: the attack redirected traffic to eBay, a resident of
2  California; the attack caused eBay to transfer funds to MTACC, another resident of California;
3  and the attack caused Yahoo, also a resident of California, to pay for clicks that did not result in
4  traffic to its sites.  (SAC ¶¶ 16, 20; Zaslavsky Decl. ¶ 1.)    Defendants designed this scheme
5  knowing and intending these consequences and knowing that harm would be suffered in
6  California as a result.  Specifically, the Defendants knew and intended that Yahoo would continue
7  to pay for ads that were never displayed, losing over a million dollars in the process.

8  ### 3.    Shutov Was Properly Served

9  The Court has already thoroughly analyzed the question of service.  The Court, after
10  briefing and supplemental briefing, found that Shutov was properly served under Rule 4(f).  (Dkt.
11  No. 53 at 2.)  Moreover, Shutov has admitted to actual notice of the action and tacitly admitted to
12  receipt of service in his April 15, 2016 letter to the Court.  (Dkt. No. 33.)

13  ### 4.    Venue is Proper

14  This Court determined that Shutov has been properly served under Rule 4(f), and directed
15  the clerk to enter default as a result of Shutov's failure to participate in the litigation.  (Dkt. No.
16  53.)  As such, any challenge to venue has been waived.  *JBR, Inc.*, 2014 WL 5034640, at *11 ("A
17  defendant, properly served with process by a court having subject matter jurisdiction, waives
18  venue by failing seasonably to assert it, or even simply by making default.") (internal citations
19  and quotations omitted).  "[V]enue is a privilege that must be seasonably asserted—at latest
20  before the expiration of the period allotted for entering a general appearance and challenging the
21  merits."  *Id.* (internal citations and quotations omitted).  For these reasons, venue is proper here
22  and beyond challenge.

23  ### C.    The Court Should Award Damages

24  The Court may award damages that Distinct Media establishes it suffered as a result of
25  Shutov's unlawful actions.  *JBR, Inc.*, 2014 WL 5034640, at *14-15.  Under the CFAA and § 502
26  (the California analog to the CFAA), a plaintiff can recover "compensatory damages and
27  injunctive relief or other equitable relief."  18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1).

28

Distinct Media suffered extensive damages from Shutov's fraudulent scheme and seeks compensation under the CFAA and § 502.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."   18 U.S.C. § 1030(e)(11).  Courts have found that under the CFAA, investigative costs and the costs of legal services connected to the violation are also recoverable.  *Facebook, Inc. v. Power Ventures, Inc.*, No. 08-CV-5780-LHK, 2013 WL 5372341, at *14 (N.D. Cal. Sept. 25, 2013) (finding Facebook entitled to compensatory damages for investigative costs and "outside legal services in connection with the Defendants' actions").  "Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the statute." *Multiven*, 725 F. Supp. 2d at 895; *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 U.S. Dist. LEXIS 153197, at *46 (E.D. Pa. Oct. 25, 2012) (finding that plaintiff's internal investigation of its websites, the hiring of a computer expert, and its subsequent security measures constituted losses under the CFAA); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 963 (D. Ariz. 2008) (finding that the cost the plaintiff incurred in conducting a forensic analysis of the defendant's computer was a loss).

Likewise, § 502 makes clear that "[c]ompensatory damages shall include [but are not limited to] any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal. Penal Code 502(e)(1).

Distinct Media incurred extensive costs in investigating and curing the damage caused by Shutov and the Defendants' fraudulent scheme.  Distinct Media paid $27,889.27 to Deloitte Consulting LLP to investigate the Jquery File's source, function, and the extent of damages to Distinct Media's Systems.  (Howsam Decl. ¶ 9, Ex. A.)

Distinct Media also incurred internal costs.  In *SuccessFactors, Inc. v. Softscape, Inc.*, plaintiff's "analysis of which restricted environments had been accessed (to determine the extent

of breach); collection and analysis of IP addresses accessing Plaintiff's network, to determine whether access was internal or hostile (to determine the appropriate response); and review of logs of documented users to confirm conclusions)" were deemed to be "losses" under the CFAA. 544 F. Supp. 2d 975, 980 (N.D. Cal. 2008). Similarly here, Mr. Howsam and John Furlong, Distinct Media's system administrator, spent well over 350 hours reviewing Distinct Media's system logs, investigating the Jquery attack, removing the Jquery File, and implementing the necessary security measures to repair and protect Distinct Media's Systems. (Howsam Decl. ¶ 9.) Distinct Media's internal investigation focused on identifying the source and/or perpetrator of the attack in order to be better equipped to prevent further damage. Distinct Media conservatively values the time spent by Messrs. Howsam and Furlong investigating the source, impact, and perpetrators of the attack at $28,542 for Mr. Howsam and $4,500 for Mr. Furlong. (*Id.*) These fees are also recoverable under Cal. Penal Code § 502(e)(1).

In the same way, legal fees incurred by Distinct Media for purposes of investigating and identifying the perpetrators of the attack through the use of third-party subpoenas to eBay, Amazon, and MTACC are also recoverable as investigative costs under the CFAA and § 502. *See Power Ventures, Inc.*, 2013 WL 5372341, at *14; *see also NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1065-66 (S.D. Iowa July 28, 2009) (finding attorneys' fees incurred in responding to the CFAA violation to put the plaintiff in their ex ante position may be counted as costs). Given the sophistication of the attack and the perpetrator's apparent intimate knowledge of Distinct Media's systems and business model, it was necessary for Distinct Media to identify the perpetrator in order to adequately protect its systems from future attacks and to understand the extent of the attack that had already occurred and whether it was ongoing, especially in light of the risk that the perpetrator was an employee of, or worked closely with, Distinct Media. In such cases courts have considered the cost of discovering the identity of the offender or the method by which the offender accessed the protected information to be part of the loss for purposes of the CFAA. *See SuccessFactors, Inc*, 544 F. Supp. 2d at 981 ("[W]here the offender has actually accessed protected information, discovering who has that information and what information he or she has is essential in remedying the harm."). After Distinct Media and Deloitte's forensic

1    investigation failed to identify the perpetrators of the attack, and eBay and Amazon refused to

2    provide information to identify the perpetrators of the attacks without a subpoena, Distinct Media

3    was forced to resort to legal action to identify Defendants.  Distinct Media incurred $119,593.00

4    in legal fees to pursue motions for expedited discovery and prepare draft subpoenas and a

5    protective order, coordinate service and execution of the subpoenas, analyze third party

6    productions, and pursue further factual identifications to identify the Doe Defendants.[3]  (Brown

7    Decl. ¶¶ 11-17.)  These costs were necessary to understand the nature, origin, and extent of the

8    attack and to prevent future attacks.

9         Additionally, because Shutov's scheme caused Distinct Media to breach the terms of its

10   agreement with Yahoo by inadvertently charging Yahoo for clicks that did not result in Yahoo ad

11   views, Distinct Media was forced to repay Yahoo $1.891 million in invalid click fees, and $1

12   million in liquidated damages.  (Howsam Decl. ¶ 11.)  The $1.891 million in invalid click fees

13   constitutes a loss from an "interruption in service," which is recoverable under the CFAA.  18

14   U.S.C. § 1030(e)(11).   Here, Shutov's actions directly caused the $1.891 million loss by

15   interrupting the legitimate service provided by Distinct Media and diverting the traffic that

16   otherwise would have merited the click fees that were charged to Yahoo.  The $1 million in

17   liquidated damages charged by Yahoo are also "consequential damages incurred because of

18   interruption of service."  18 U.S.C. § 1030(e)(11).  But for the interruption of Distinct Media's

19   legitimate ad service, Distinct Media would not been compelled to pay liquidated damages under

20   the Yahoo contract.  Moreover, the full $2.891 million paid to Yahoo as a result of the attack is

21   recoverable under § 502 as "damage or loss" suffered "by reason of a violation" of that statute.

22   Cal. Penal Code § 502(e)(1).

23        The CFAA and § 502 also allow for "equitable relief."  18 U.S.C. § 1030(g); Cal. Penal

24   Code § 502(e)(1).  In addition to compensatory damages, Distinct Media seeks disgorgement and

25   a return of any money that accrued to Shutov as a result of Shutov's fraudulent scheme under a

26   theory of unjust enrichment.  This includes the $335,308.16 that was deposited in Shutov's

27

28   _____

[3] The Brown Declaration includes all information required by Civil Local Rule 54-5(b) for a
motion for attorney's fees.

MTACC account between July of 2013 and December of 2014.   (Zaslavsky Decl. ¶ 8.)
Moreover, the UCL allows for restitution.   As these funds would have otherwise accrued to
Distinct Media, they are properly recovered by Distinct Media here.

### D.   The Court Should Enter a Permanent Injunction Against Shutov

Distinct Media requests that this Court grant permanent injunctive relief enjoining Shutov
and all others acting in concert with Shutov from (i) accessing or attempting to access Distinct
Media's computers, computer systems, or computer networks; (ii) deleting, altering, modifying,
or adding data, code, programs, or other unauthorized information to Distinct Media's computers,
computer systems, or computer networks; and (iii) any further acts constituting violations of the
CFAA, § 502, or the UCL with respect to Distinct Media and its computers, computer systems,
and computer networks.   The CFAA, § 502, and the UCL provide the authority for entry of an
injunction that bars future violations of Distinct Media's rights.   *See* 18 U.S.C. § 1030(g); Cal.
Penal Code § 502(e)(1); Cal. Bus. & Prof. Code § 17203.

To obtain permanent injunctive relief, a plaintiff must show "(1) that it has suffered an
irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate
to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff
and defendant, a remedy in equity is warranted; and (4) that the public interest would not be
disserved by a permanent injunction."   *Craigslist, Inc.*, 2012 U.S. Dist. LEXIS 108573, at *44.
Shutov's hacking activity has harmed and continues to harm Distinct Media's reputation and
goodwill with its business partners, namely Yahoo.   *See, e.g.*, *Gucci Am., Inc. v. Huoqing*, No. C-
09-05969 JCS, 2011 U.S. Dist. LEXIS 783, at *44 (N.D. Cal. Jan. 3, 2011) (irreparable injury
would be suffered to reputation and goodwill if injunctive relief not granted against online
infringer and counterfeiter).   Further, the injunctive relief Distinct Media requests is narrowly
tailored to bar Shutov from engaging in the activities that led to this litigation: namely, the
unauthorized access and alteration of Distinct Media's proprietary systems and diversion of
Internet traffic from Distinct Media's websites.   *Chanel, Inc. v. Lin*, No. C-09-04996 JCS, 2010
U.S. Dist. LEXIS 61295, at *35 (N.D. Cal. May 7, 2010) ("[A]n injunction must be narrowly
tailored to remedy only the specific harms shown by the plaintiffs rather than to enjoin all

possible breaches of the law.") (quoting *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 998-1002 (N.D. Cal. 2006) (internal quotations omitted)).

## IV.    CONCLUSION

For these reasons, default judgment should be entered against Shutov and an award of damages, disgorgement, restitution, and injunctive relief should issue.

Dated: December 6, 2016                          COOLEY LLP

                                                  */ s / Matthew D. Brown*
                                                 Matthew D. Brown

                                                 Attorneys for Plaintiff
                                                 DISTINCT MEDIA LIMITED

136068557

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9

## PROOF OF SERVICE
### (FRCP 5)

I am a citizen of the United States and a resident of the State of California.   I am employed in San Francisco County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.   I am over the age of eighteen years, and not a party to the within action.   My business address is Cooley LLP, 101 California Street, 5th Floor, San Francisco, California 94111-5800.   On the date set forth below I served the document described below in the manner described below:

10

**PLAINTIFF DISTINCT MEDIA LIMITED'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT LEV SHUTOV**

11
12
13

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

14
15

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

16
17
18

☒ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by FedEx for overnight delivery.

19
20

☒ (BY ELECTRONIC MAIL) I am personally and readily familiar with the business practice of Cooley LLP for the preparation and processing of documents in portable document format (PDF) for e-mailing, and I caused said documents to be prepared in PDF and then served by electronic mail to the parties listed below.

21
22

on the following parties in this action:

23
24
25

Ruslan Ivanov                                    *Attorney for Defendant Lev Shutov*
Russian Federation, Mari El republic
Yoshkar-Ola, Chavaina 36-306
424000
Email:  advokaton@mail.ru

26

Executed on December 6, 2016, at San Francisco, California.

27

*/s/ Patricia Mines*
Patricia Mines

28

139820641

Cooley LLP
Attorneys At Law
San Francisco

Proof of Service for Distinct Media Ltd.'s Motion
for Default Judgment Against Def Lev Shutov
Case No. 15-cv-03312-NC